UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JIM HAVENS, Individually and o/b/o ROC Love Will
End Abortion, an unincorporated association,

                        Plaintiff,

                v.

LETITIA A. JAMES, Attorney General of the State of
New York, in her official capacity as Attorney General
of the State of New York and THE CITY OF ROCHESTER,

                        Defendants.

_____

<u>DECISION AND ORDER</u>

19-CV-6482L

## <u>INTRODUCTION</u>

Once again, this Court is asked to determine the extent to which anti-abortion protestors

and groups can engage in activities at a facility in Rochester, New York, Planned Parenthood of

Rochester ("PPR"), which provides reproductive health care services, including abortions.  The

activities plaintiffs here seek to engage in have been litigated literally for decades, before this Court

on several occasions, the Second Circuit on several occasions, and the United States Supreme

Court.  *See Pro-Choice Network of Western N.Y. v. Project Rescue Western N.Y.*, 799 F. Supp.

1417 (W.D.N.Y. 1992), *aff'd in part & rev'd in part*, 67 F.3d 359 (2d Cir. 1994), *aff'd as modified*,

67 F.3d 377 (2d Cir. 1995) (en banc), *aff'd in part & rev'd in part sub nom. Schenck v. Pro-Choice

Network of Western N.Y.*, 519 U.S. 357 (1997) (collectively "*Schenck*"); *see also New York ex rel.

Spitzer v. Operation Rescue Nat'l*, 99-cv-209A, 2000 U.S. Dist. LEXIS 20059 (W.D.N.Y. 2000),

*aff'd in part & vacated in part*, 273 F.3d 184 (2d Cir. 2001) ("The Western District of New York

has been the site of ongoing anti-abortion protests going back at least a decade") (collectively "*Operation Rescue National*"). Familiarity with this lengthy litigation history is presumed.

Almost 20 years ago, on July 26, 2000, United States District Judge Richard J. Arcara, after conducting a lengthy 23-day hearing throughout August and September 1999, issued a preliminary injunction restricting anti-abortion protests in several respects. That preliminary injunction was later modified on April 21, 2002, and converted to a permanent injunction on October 31, 2005 (the "Arcara Injunction"), after the United States Court of Appeals for the Second Circuit affirmed the terms of the original preliminary injunction in substantial part. *See generally Operation Rescue Nat'l*, 273 F.3d 184 (2d Cir. 2001). The Arcara Injunction, which has been in effect and controlled activities at PPR for the past eighteen years – and, indeed, at all facilities providing reproductive health care services in this District – is the subject of the present action.

The Arcara Injunction was generally designed to curb certain conduct in the vicinity of reproductive health care facilities in order to protect and ensure, among other things, patients' peaceable access to such facilities. *See Operation Rescue Nat'l*, 273 F.3d at 201. One method specified in the injunction by which to accomplish this intention was to enjoin and restrain, without exception, "demonstrating, congregating, standing, sitting, or lying on, or posting or carrying signs, or being present within fifteen feet of either edge of any doorway, walkway or driveway entrance to any such facility." (Dkt. # 1-1 at ¶ 1(G)). The Second Circuit referred to this buffer zone as a "nonporous no-protest zone." *Operation Rescue Nat'l*, 273 F.3d at 211.

The injunction thus limited protest actions in two significant ways. First, it established a 15-foot buffer zone at facilities like PPR, within which no protest activity was to occur. Second, the injunction eliminated a provision contained in a prior injunction – the 1992 injunction at issue

in *Schenck* – which had allowed two sidewalk counselors to engage in certain activity within the 15-foot buffer zone.

On appeal to the Second Circuit, the buffer zone and the elimination of the sidewalk-counselor exception were raised and, with some modification, the Second Circuit affirmed both provisions in the Arcara Injunction. Over the years, fast approaching 20 years, anti-abortion protestors have largely complied with the dictates of the Arcara Injunction.

In the present action, the plaintiff Jim Havens ("Havens"), individually and on behalf of ROC Love Will End Abortion ("ROC Love"), an unincorporated association of pro-life Rochester-area residents (together with Havens, the "plaintiffs"), principally seeks a declaration from this Court that he and others associated with him can engage in conduct specifically prohibited by the Arcara Injunction at PPR, and an order precluding defendants New York State Attorney General Letitia James (the "AG") and the City of the Rochester (the "City") (together with the AG, the "defendants") from enforcing the Arcara Injunction against them. (*See* Dkt. # 1 at 12-13). In a nutshell, Havens contends that he is not barred from engaging in protest activities within the 15-foot buffer zone and he should be free to engage in "sidewalk counseling" activities with any woman approaching PPR without consequence. (*See generally* Dkt. # 1).

Pending are three motions in relation to plaintiffs' complaint: (1) plaintiffs' motion for a preliminary injunction enjoining defendants from enforcing the Arcara Injunction against them while this case is pending (Dkt. # 2); (2) the City's motion to dismiss plaintiffs' complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (Dkt. # 6); and (3) the AG's similar motion to dismiss plaintiffs' complaint for failure to state a claim pursuant to Rule 12(b)(6) (Dkt. # 7).

The Court held oral argument on these motions on November 4, 2019. (Dkt. # 19; *see also* Dkt. # 23 (transcript of oral argument, cited herein as "Tr. __")). At plaintiffs' request, the Court also permitted post-argument submissions (Dkt. ## 21, 22), which only Havens and the AG submitted (Dkt. ## 24, 25).

The Court has carefully reviewed the parties' submissions. For the following reasons, defendants' motions to dismiss the complaint (Dkt. ## 6, 7) are granted, and plaintiffs' motion for a preliminary injunction (Dkt. # 2) is denied. Plaintiffs' complaint is therefore dismissed.

## BACKGROUND

### A. The Arcara Injunction[1]

#### 1. Relevant Provisions

On March 22, 1999, because of serious and ongoing protests, threats and obstruction occurring at reproductive health care facilities in the Western District of New York, the Attorney General of the State of New York, pursuant to the Freedom of Access to Clinic Entrances Act ("FACE"), 18 U.S.C. § 248, *et seq.*, and New York State public nuisance and trespass laws, commenced an action to enjoin illegal activity at these facilities. *See generally Operation Rescue Nat'l*, 2000 U.S. Dist. LEXIS 20059 at 1. That action ultimately resulted in the issuance of the Arcara Injunction. (Dkt. # 1-1).

The injunction was designed to be, and was, broad in scope: both as to those subject to the injunction and as to the prohibited activities. The injunction of course applied to the scores of named defendants, as well as "John and Jane Does"[2] and other persons acting on behalf of or "in

---

[1] Plaintiffs attach and incorporate a copy of the Arcara Injunction to their complaint (Dkt. ## 1 at ¶ 2; 1-1), and the Court will therefore consider the Arcara Injunction in resolving the pending motions, including defendants' motion to dismiss. *See City of Pontiac Policemen's & Firemen's Retirement Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014). The Court will also consider the Second Circuit's review of the Arcara Injunction.

[2] "John and Jane Does" were defined as "fictitious names, the real names of such persons being currently unknown but who are active in defendant organizations or act in concert with the [named defendants] to engage in, or who will

concert with" defendants. Specifically, the injunction applied to: "defendants[,] the officers, directors, agents, and representatives of defendants[,] all other persons whomsoever, known or unknown, acting in defendants' behalf or in concert with defendants[,] and any persons present protesting against defendants' activities, and receiving actual or constructive notice of th[e] [Arcara Injunction]." (Dkt. # 1-1 at 3).

The injunction "enjoined and restrained" conduct described therein at "any facility providing reproductive health care services in the Western District of New York . . . including any hospital, clinic, physician's office or other facility that provide[d] medical, surgical, counseling or referral services relating to the human reproductive system, including services relating to pregnancy or the termination of a pregnancy." (*Id.* at ¶ 1(A)). One such facility was Planned Parenthood of the Rochester/Syracuse Region, Inc., located at 114 University Avenue in Rochester, New York – the facility at issue in the current case. (*Id.* at 6; *see also* Dkt. # 1 at ¶ 1).

The conduct enjoined at these facilities included "trespassing on, standing, sitting, lying or being present in or on, or blocking, impeding or obstructing ingress or egress from, any parking lot, driveway, driveway entrance, or walkway entrance . . . and the parking lots used by the patients and staff of any such facility." (Dkt. # 1-1 at ¶ 1(B)). Also prohibited was "physically abusing, grabbing, touching, pushing, shoving, crowding or tortuously harassing persons entering or leaving, working at or using the services of any such facility." (*Id.* at ¶ 1(D)). In addition, the Arcara Injunction enjoined "demonstrating, congregating, standing, sitting, or lying on, or posting or carrying signs, *or being present within fifteen feet* of either edge of any doorway, walkway or

engage in, the conduct complained of" in the Arcara Injunction. (*See generally* Dkt. # 1-1). The Second Circuit specifically acknowledged the inclusion of unidentified "John and Jane Does" as named parties to the injunction and noted that "aspect of the injunction was not challenged on appeal." *See Operation Rescue Nat'l*, 273 F.3d at 200 n.9.

5

driveway entrance to any such facility." (*Id.* at ¶ 1(G) (emphasis supplied)).[3] Furthermore, the Arcara Injunction enjoined those covered by the injunction "from inducing, directing, aiding or abetting in any manner, others to take any of the actions described in [the Arcara Injunction]." (*Id.* at ¶ 4).

The Arcara Injunction also specified that it was not to be construed "to limit defendants and those acting in concert with them from exercising their legitimate rights under the First Amendment of the United States Constitution," or to "supersede or diminish the obligation of federal, state and local law enforcement authorities to fulfill their duties and responsibilities in enforcing federal and state laws and local ordinances." (*Id.* at 7).

## 2. <u>Second Circuit Decision in 2001 Affirming the Arcara Injunction in Part</u>

The Second Circuit's decision in 2001 affirming the most significant aspects of the Arcara Injunction speaks directly to issues now raised by Havens in the present action. In one sense, the Circuit's rulings would seem to control and in essence constitute the law of the case here. The Circuit's decision established several important principles which affect, and in several particulars, control the present action.

On the one hand, Havens seems to acknowledge the precedential effect of the Circuit's decision, affirming the 15-foot buffer zone and eliminating the so-called sidewalk-counselor exception. In fact, at oral argument on the pending motions, counsel for Havens stated "[w]e're not challenging the [Arcara Injunction] at all." (*See* Tr. 5:25-6:1).

In spite of that disclaimer, however, the papers submitted by Havens and counsel forcefully argue that the 15-foot buffer zone interferes with Havens's First Amendment rights and prevents

---

[3] The original version of the Arcara Injunction, issued in 2000, expanded this 15-foot no-protest zone at PPR, and effectively barred protest activity for "over one hundred feet of sidewalk all along the PPR facility[.]" *See Operation Rescue Nat'l*, 273 F.3d at 209-10. This is one aspect of the original injunction that was vacated by the Second Circuit and modified by the Arcara Injunction.

Havens and others from effectively conversing with and "counseling" those women entering PPR. (*See, e.g.*, Dkt. # 1 at ¶ 37 (describing the 15-foot buffer zone as "very burdensome" on plaintiffs' ability to counsel "abortion-minded women who approach" PPR, and stating that buffer zone prevents plaintiffs from having "intimate conversation in close proximity" with these women)).

Although the Arcara Injunction listed numerous individuals and entities, only two defendants in that case pursued an appeal before the Second Circuit. *See Operation Rescue Nat'l*, 273 F.3d at 190. The Court of Appeals discussed the activities of one of the defendants, Mary Melfi, in depth and determined that the injunction was well warranted based on her conduct. *See id.* at 193-97. Although not a defendant to the current action, as discussed in greater detail below, Melfi – now Mary Jost – is mentioned prominently in the papers now before the Court.

Specifically, Melfi challenged the constitutionality of the injunction, its impact on First Amendment rights, the onerous nature of the 15-foot buffer zone, and the sidewalk-counselor exception. The Second Circuit dealt with each item, ruled against Melfi and upheld the injunction.

As far as the injunction's constitutionality, the Second Circuit noted that it was "well settled" that an injunction like the Arcara Injunction, which was "directed at protestors outside of abortion clinics but based on their unlawful behavior," was "content neutral." *Id.* at 202. Moreover, the injunction served to protect the "significant governmental interest[s]" of: "(1) ensuring public safety and order; (2) protecting freedom to receive reproductive health services; (3) advancing medical privacy and the well-being of patients seeking care at facilities; and (4) safeguarding private property." *Id.* These interests were "capable of supporting injunctive restrictions on protest behavior." *Id.*

The Second Circuit also approved the 15-foot "no-protest" buffer zone at PPR. *See id.* at 204 ("[t]he Supreme Court has previously reviewed and sustained court-made buffer zones of

fifteen feet at these sites") (citing *Schenck*, 519 U.S. at 380). As noted above, *see supra* n.3, the version of the Arcara Injunction reviewed by the Circuit significantly expanded the protective zone around the PPR facility beyond 15 feet, but the Circuit vacated that portion of the injunction finding that it unnecessarily curtailed the right of protestors to engage in their desired activities. *See Operation Rescue Nat'l*, 273 F.3d at 209-10.

Yet the Circuit was quite clear, based on its review of the facts and citing numerous other cases upholding similar buffer zones, that the 15-foot zone here was reasonable and did not unduly curtail the ability of protestors to make their views known. *See id.* at 211 (stating that even with the imposition of the 15-foot no-protest zone and the elimination of the sidewalk-counselor exception, "protestors will still be able to stand along the sidewalks outside of the buffer zones, picketing and praying and passing out materials"). In other words, the Circuit noted that protestors could effectively present their message in spite of the 15-foot buffer zone. *See id.* at 204 (eliminating expanded buffer zone beyond 15 feet because those expanded zones "effectively prevented protestors from . . . communicating from a normal conversational distance along the public sidewalk," necessarily concluding that the 15-foot buffer zone did not impose such a burden). Indeed, a 15-foot zone is rather modest, and protestors' voices are well within earshot of visitors to PPR. At argument on the pending motions, the Court noted that 15 feet was the appropriate distance from the lecterns used by counsel to the position of the Court on the bench. (*See* Tr. 34:9-14).

In addition, the Second Circuit affirmed the exclusion of the so-called "sidewalk counselor" exception to the 15-foot buffer zone. *See Operation Rescue Nat'l*, 273 F.3d at 210-11. That exception, which existed in a 1992 version of the injunction, "permitted two protestors to

enter the buffer zones for the purpose of sidewalk counseling consisting of conversation of a non-threatening nature." *Id.* at 210 (quotations omitted).

The Second Circuit noted that "[w]hen the Supreme Court reviewed the 1992 Injunction it concluded that the sidewalk-counselor exception was not necessary for the buffer zones to survive constitutional scrutiny." *Id.* (citing *Schenck*, 519 U.S. at 381 n.11 ("It is clear from the District Court's opinion that its decision to allow two sidewalk counselors inside the buffer zones was an effort to bend over backwards to 'accommodate' defendants' speech rights[;] . . . [t]he District Court was entitled to conclude on this record that the only feasible way to shield individuals within the fixed buffer zone from unprotected conduct – especially with law enforcement efforts hampered by defendants' harassment of the police – would have been to keep *the entire area clear* of defendant protesters") (citations omitted) (emphasis supplied)).

The Second Circuit continued:

> Besides being a constitutionally unnecessary accommodation, the sidewalk-counselor exception has also proven to disrupt clinic access and complicate enforcement of the injunction. In fact, insofar as protestors have disrupted clinic access in the Western District of New York, the sidewalk-counselor exception has been a primary tool used to facilitate disruptive behavior. In part, protestors abused the limited exception, which permitted only two protestors within the buffer zones, by flooding the zones with many protestors. At times, the sidewalk counselors would stand in driveways and block traffic. Protestors also took advantage of the exception to stand within buffer zones even when there were no patients to counsel. When patients were present, the 'sidewalk counselors' shouted at them through bull horns, notwithstanding that the exception permitted only 'conversation of a non-threatening nature.' Based on this record, the District Court found that protestors used the zones to make ingress and egress unreasonably difficult. We further note that the clarity of the *nonporous no-protest zone* will help police violations of the District Court's order.

*Id.* at 211 (emphasis supplied).

Furthermore, the Second Circuit recognized that the sidewalk counselor exception was "logistically unsupportable," and that the "amendment to exclude *all protestors* from the area immediately around entrances and driveways [was] narrowly tailored to serve the governmental interest in protecting clinic access." *Id.* (emphasis supplied).

### B. <u>Facts</u>[4]

In October 2017, Havens formed an association consisting of "pro-life individuals who witness, counsel and pray with Havens on the public sidewalk at the Rochester Planned Parenthood facility." (Dkt. # 1 at ¶¶ 13, 14). He initially called this association ROC Sidewalk Advocates for Life, but later renamed the group to ROC Love Will End Abortion in 2019. (*Id.* at ¶ 13). Plaintiffs specifically target "abortion-minded women"[5] seeking services at PPR and "regularly assemble" at that location to engage in anti-abortion conduct. (*Id.* at ¶¶ 1, 24). Plaintiffs acknowledge that yellow lines are painted on the sidewalk "on either side of the entrance to Planned Parenthood" to delineate the 15-foot buffer zone detailed in the Arcara Injunction. (*Id.* at ¶ 22).

To further the interests of his association, in 2017, Havens received "training materials and other information" from Sidewalk Advocates for Life, which is a national sidewalk counseling support group. (*Id.* at ¶ 23). With this material, Havens trained "persons interested in sidewalk counseling" in topics such as "non-violent and non-confrontational methods of initiating conversations with abortion-minded women to discuss options other than abortion that they might want to consider." (*Id.* at ¶ 23). At least some of these trainings were held at Focus Pregnancy Help Center, which is located near PPR, and is an organization founded by Mary Jost – named as a defendant in *Operation Rescue National* as Mary Melfi. (*Id.* at ¶¶ 43, 48).

---

[4] The following facts are taken from plaintiffs' complaint and are accepted as true for purposes of defendants' motions to dismiss.

[5] It is unclear how plaintiffs determine which women seeking services at PPR are "abortion-minded."

Havens alleges that he was not specifically named as a party in the Arcara Injunction. (*Id.* at ¶ 26). Accordingly, Havens alleges that when he began engaging in anti-abortion conduct outside of PPR in 2017, he was unaware of the Arcara Injunction – apparently, the painted yellow lines on the sidewalk notwithstanding. (*Id.* at ¶ 25). As a result, Havens admits that he often breached what the Second Circuit affirmed as the "nonporous no-protest" 15-foot buffer zone contained in the Arcara Injunction. (*Id.* at ¶ 26); *see also Operation Rescue Nat'l*, 273 F.3d at 211.

As the number of people participating in Havens's association increased towards the end of 2017, security guards from PPR notified plaintiffs of the Arcara Injunction and the restrictions contained therein. (*Id.* at ¶ 28). Havens, however, took the position that because neither he nor others with him were named in the Arcara Injunction, its terms did not apply to them. (*Id.* at ¶ 30).

In plaintiffs' view, the 15-foot buffer zone – upheld by the Supreme Court in *Schenck* and the Second Circuit in *Operation Rescue National* – is "very burdensome" on their ability "to reach out to abortion-minded women who approach" PPR. (*Id.* at ¶ 37). The buffer zone apparently renders them "unable . . . to have an intimate conversation in close proximity with a woman who is willing to talk to them following their offer to discuss [a woman's] abortion decision and possible alternatives to it." (*Id.*). Conversing with these women from fifteen feet away is, according to plaintiffs, "counterproductive to their ability to communicate effectively." (*Id.*).[6]

Plaintiffs' continued presence in the no-protest zone prompted PPR to call the Rochester Police Department ("RPD") "[s]everal times from late 2017 through mid[-]2018" to complain that plaintiffs were violating the Arcara Injunction's buffer zone requirement. (*Id.*).

---

[6] Although plaintiffs allege that the 15-foot zone is inconvenient and burdensome, some of the materials submitted relative to the motion for a preliminary injunction demonstrate that plaintiffs have on occasion been successful in engaging women in spite of the 15-foot limitation. (*See, e.g.*, Dkt. # 9-1 at 26, 30, 41, 43). In fact, it appears that plaintiffs successfully communicated with some women and convinced them to seek services at Focus Pregnancy Help Center, operated by Jost, rather than PPR.

In June 2018, RPD Captain David Smith ("Smith") "verbally informed" Havens that the Arcara Injunction applied to plaintiffs and that plaintiffs would be required to comply with the 15-foot buffer zone. (*Id.* at ¶ 32). Plaintiffs allege, upon information and belief, that this directive followed from a meeting between PPR and the RPD. (*Id.*).

Plaintiffs thereafter retained counsel and challenged the City's position that the Arcara Injunction applied to them (*id.* at ¶ 34); the parties then exchanged several letters regarding the applicability of the Arcara Injunction to plaintiffs (*id.* at ¶¶ 35, 39, 41, 42).

Havens acknowledges that the Arcara Injunction still binds certain individuals. For example, plaintiffs allege that Havens was aware of two other individuals, Michael McBride and Robert Pokalsky, who sidewalk counseled at PPR and who were named defendants in the Arcara Injunction. (*Id.* at ¶ 38). Havens, after consulting with counsel, informed McBride and Pokalsky that they were bound by the Arcara Injunction. (*Id.*). Similarly, again after consulting with counsel, Havens told Mike Warren, the leader of Rescue Rochester – an organization named as a defendant in the Arcara Injunction – who also sidewalk counseled at PPR, that Warren was bound by the Arcara Injunction. (*Id.* at ¶¶ 52-53). It is fair to infer from these allegations that plaintiffs were engaged in the same conduct at the same location as parties enjoined by the Arcara Injunction.

On September 21, 2018, the City sent Havens's counsel a letter stating that the City and the AG's Office had "reviewed evidence demonstrating that . . . [plaintiffs] [were] in fact acting in concert with several of the defendants" named in *Operation Rescue National*, and that, "effective immediately," plaintiffs would be expected to "abide by the [Arcara] Injunction and to respect the 15-foot buffer zone surrounding all entrances and exits to [PPR]." (*Id.* at ¶ 39).

Plaintiffs further allege that around the same time the AG's Office sent its September 28, 2018, letter, a reporter informed Havens that the specific evidence possessed by the AG's Office and referenced in that letter consisted of:

    a.  "A Facebook post by Rescue Rochester (one of the original defendants named in the 2005 order) promoting training by Jim Havens and Sidewalk Advocates at the Focus Pregnancy Help Center (which is run by Mary Jost [formerly Melfi], another one of the original defendants named in the 2005 order)."

    b.  "A Facebook post by Jim Havens promoting a training at Focus Pregnancy Help Center."

    c.  "A mailing from Rescue Rochester urging its members to join Jim Havens and Sidewalk Advocates for Life at their monthly protest outside Planned Parenthood on University Avenue."

    d.  "A screenshot of the Focus Pregnancy Help Center's website promoting a Jim Havens and Sidewalk Advocates for Life protest outside Planned Parenthood on University Avenue."

(*Id.* at ¶ 43).

Plaintiffs do not deny the accuracy of this evidence, but deny that such evidence demonstrates they are in "active concert or participation" with persons enjoined by the Arcara Injunction. (Dkt. # 11 at 10 n.2). Specifically, plaintiffs allege that they are not officers, agents, servants, employees, or attorneys of McBride, Pokalsky, Jost, Warren or Rescue Rochester, or any other defendant named in the Arcara Injunction, or visa versa. (Dkt. # 1 at ¶¶ 45, 49, 54, 57). Plaintiffs further allege that they have not acted in concert or participation with any defendants named in the Arcara Injunction, or with any of the named defendants' officers, agents, servants, employees, or attorneys, "for the purpose of aiding or abetting any of them to violate the [Arcara] Injunction" (*id.* at ¶¶ 46, 50, 55), and that they are "unaware" that those enjoined defendants have violated the Arcara Injunction (*id.* at ¶¶ 47, 51, 56).

# DISCUSSION

## I.  Defendants' Motions to Dismiss[7]

### A.  Legal Standard

On a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff.  *See Trs. of the Upstate New York Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016), *cert. denied*, 137 S.Ct. 2279 (2017).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  However, "general, conclusory allegations need not be credited . . . when they are belied by more specific allegations of the complaint."  *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995).

Moreover, in deciding a motion to dismiss, the court may "consider any written instrument attached to the [c]omplaint as an exhibit or any statements or documents incorporated in it by reference."  *City of Pontiac Policemen's & Firemen's Retirement Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014) (alterations and quotations omitted).

### B.  "Persons Bound" by an Injunction

Plaintiffs' request in their complaint for declaratory and injunctive relief boils down to one question: whether plaintiffs are "persons bound" by the Arcara Injunction.

Rule 65 of the Federal Rules of Civil Procedure specifies three categories of persons who, upon receiving "actual notice" of an injunction, are bound by its terms: (A) the parties to the

---

[7]  The Court will first consider defendants' pending motion to dismiss, "as dismissal [of plaintiffs' complaint] would render moot the matter of preliminary injunctive relief."  *Wheeler v. Cohen*, 2015 WL 6872338, *2 (D. Vt. 2015).

injunction; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are "in active concert or participation" with anyone described in the other two categories. *See* FED. R. CIV. P. 65(d)(2). The rule "is designed to codify the common-law doctrine 'that [parties named in an injunction] may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding.'" *Heyman v. Kline*, 444 F.2d 65, 66 (2d Cir. 1971) (quoting *Regal Knitwear Co. v. Nat'l Labor Relations Bd.*, 324 U.S. 9, 14 (1945)); *accord Roe v. Operation Rescue*, 54 F.3d 133, 139 (3d Cir. 1995) ("an instigator of contemptuous conduct may not absolve himself of contempt liability by leaving the physical performance of the forbidden conduct to others") (quotations omitted).

In other words, while it is well-settled that a court, through issuance of an injunction, "cannot lawfully enjoin the world at large," *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832 (2d Cir. 1930), it is equally well-established that "[e]very injunction issued by a district court automatically forbids others – who are not directly enjoined but who are 'in active concert or participation' with an enjoined party – from assisting in a violation of the injunction," *NML Capital, Ltd. v. Republic of Argentina*, 727 F.3d 230, 243 (2d Cir. 2013) (citing FED. R. CIV. P. 65(d)), *cert. denied*, 573 U.S. 927 (2014).

One such way non-parties act "in active concert or participation" with enjoined parties, and thus become bound by an injunction, is by aiding and abetting enjoined parties in carrying out conduct violative of the injunction. *See S.E.C. v. Platinum Inv. Corp.*, 98 Fed. Appx. 33, 35 (2d Cir. 2004) (summary order) ("Generally, injunctions can bind only parties (and not acts); Rule 65(d), however, creates a carve-out for nonparties who have actual notice of an injunction and are guilty of aiding and abetting or acting in concert with a named defendant or his privy in violating an injunction.") (alterations and quotations omitted); *see also Rockwell Graphic Sys., Inc. v. DEV*

*Indus., Inc.*, 91 F.3d 914, 919-20 (7th Cir. 1996) ("parties otherwise without an injunction's coverage may subject themselves to its proscriptions should they aid or abet the named parties in a concerted attempt to subvert those proscriptions"); *Arista Records, LLC v. Tkach*, 122 F. Supp. 3d 32, 36 (S.D.N.Y. 2015) ("general applications of Rule 65 . . . have noted that 'active concert or participation' exists if the third party 'aided and abetted' the party subject to the injunction"). *Accord Alemite Mfg. Corp.*, 42 F.2d at 832 ("a person who knowingly assists a defendant in violating an injunction subjects himself to civil as well as criminal proceedings for contempt").

Non-parties thus act in "concert or participation" with enjoined parties where they have "actual knowledge of the judicial decree and violated it, and . . . the challenged action was taken for the benefit of, or to assist, a party subject to the decree." *Arista Records, LLC*, 122 F. Supp. 3d at 36; *see also Roe*, 54 F.3d at 140 (nonparties acted "in concert" with enjoined parties, and thus were themselves covered by the injunction, where nonparties "coordinated activities" with enjoined parties to violate the injunction). The Second Circuit has noted several times that "[a] court's inquiry into the fact of aiding and abetting is 'directed to the actuality of concert or participation, without regard to the motives that prompt the concert or participation." *Eli Lilly & Co. v. Gottstein*, 617 F.3d 186, 193 (2d Cir. 2010) (quoting *New York State Nat'l Org. for Women v. Terry*, 961 F.2d 390, 397 (2d Cir. 1992), *vacated on other grounds sub nom. Pearson v. Planned Parenthood Margaret Sanger Clinic (Manhattan)*, 507 U.S. 901 (1993)); *accord Rockwell Graphic Sys., Inc.*, 91 F.3d at 920 ("A court must consider the extent of the alleged 'active concert or participation' of third parties with those named in the injunction in determining whether the injunction's prohibitions shall apply to those third parties.").

## C.  Analysis

I note at the outset that Haven's initial argument to security guards at PPR and the RPD that the Arcara Injunction did not apply to him because his name is not listed specifically as a defendant in the injunction (*see* Dkt. # 1 at ¶¶ 30, 31) – which is not Havens's sole argument in this case – is not unique to the litigation that has occurred in this situation over time.  Such an argument was in fact raised by Mary Melfi (Jost) before the Second Circuit in *Operation Rescue National*.  The Circuit gave short shrift to the argument that the 1992 injunction at issue in *Schenck* did not bind those not named as defendants therein, such as Melfi, noting that it was based on "a questionable legal theory."  *Operation Rescue Nat'l*, 273 F.3d at 205.

The Circuit further dismissed this argument at footnote 14 in its decision noting that Melfi's argument had a "shaky legal foundation."  *Id.* at 205 n.14.  Significant for our purposes here, the Court noted that Melfi might have otherwise been covered by the 1992 injunction, despite not being a named defendant in that action, because the injunction also bound those "acting in concert with" the named defendants in the prior injunction, perhaps alluding to Melfi's participation with named defendants to engage in enjoined conduct.  This of course is squarely on point in the present proceedings involving plaintiff Havens.

Here, the "actuality" of plaintiffs' own concert and participation with parties named in the Arcara Injunction, specifically, McBride, Pokalsky, Jost, and Rescue Rochester (together, the "Named Defendants"), which is evident from the allegations in plaintiffs' complaint, demonstrates that plaintiffs clearly qualify as persons "in active concert or participation" with the Named Defendants, and are accordingly "persons bound" by the Arcara Injunction.  *See* Fed. R. Civ. P. 65(d)(2)(C).

Initially, the allegations demonstrate that plaintiffs became aware of the Arcara Injunction in "the latter part of 2017" – and thus were put on notice of its terms – when a security guard from PPR notified Havens of the injunction's terms and provided him with a copy of the injunction. (Dkt. # 1 at ¶¶ 27-30); *see, e.g.*, *People of the State of New York by Vacco v. Operation Rescue Nat'l*, 80 F.3d 64, 67-68, 70 (2d Cir.) (undisputed that respondents received notice of injunction when police officer read it aloud to them at the location of anti-abortion protest), *cert. denied*, 519 U.S. 825 (1996). Nonetheless, it is apparent that plaintiffs repeatedly violated the terms of the Arcara Injunction through 2018. (*See* Dkt. # 1 at ¶ 31 (detailing that PPR called the RPD "several times" in 2017 and 2018, "complaining that Plaintiffs were violating the 15-foot buffer zone imposed by the [Arcara] Injunction")).

Moreover, with notice of the Arcara Injunction, plaintiffs indisputably coordinated their efforts to violate the Arcara Injunction by sidewalk counseling at PPR within the buffer zone with the Named Defendants. First, as early as 2017, Havens "secured" materials in order to train any persons interested in sidewalk counseling with him at PPR. (*Id.* at ¶ 23). Plaintiffs admit that Havens held these training sessions – which were designed to further plaintiffs' effectiveness in sidewalk counseling outside PPR – at Focus Pregnancy Help Center, a facility founded and organized by Jost. (*Id.* at ¶¶ 23-24, 48). Furthermore, Jost's Focus Pregnancy Help Center promoted plaintiffs' activities outside PPR on its website. (*Id.* at ¶ 43(d)). It is clear then, that while Jost may not have sidewalk counseled "as part of [Havens's] association" (*id.* at ¶ 48), Jost provided specific aid to plaintiffs through other means to enable plaintiffs to further their goals, both by providing a physical space at which plaintiffs could train its members, and by advertising, publicizing, and soliciting participants for plaintiffs' activities, and that plaintiffs violated the terms of the Arcara Injunction thereafter.

Second, it is fair to infer from the complaint that plaintiffs perform their sidewalk counseling shoulder to shoulder with at least McBride and Pokalsky, and that those Named Defendants participate in sidewalk counseling as part of ROC Love. (*Id.* at ¶ 38). Specifically, unlike the allegations related to Jost, plaintiffs do not affirmatively allege that McBride's and Pokalsky's sidewalk counseling at PPR is done independent of plaintiffs' sidewalk counseling. (*Compare id.* at ¶ 48, *with id.* at ¶¶ 44-47). Nor would McBride's and Pokalsky's participation with plaintiffs in their joint goal to deter women from seeking the services of PPR be surprising. *See Vacco v. Operation Rescue Nat'l*, 80 F.3d at 71 (noting in the context of anti-abortion organizations that "similarly constituted groups of individuals move fluidly between multiple unincorporated associations that share the same basic leadership and goals"). Therefore, the membership and participation of McBride and Pokalsky with plaintiffs, even assuming those Named Defendants themselves did not cross into the buffer zone, enabled plaintiffs to further their shared common goal with Named Defendants.

In addition, the inference that McBride and Pokalsky sidewalk counsel with plaintiffs is further supported by the fact that Havens felt the need to provide legal counsel to those Named Defendants regarding their obligations under the Arcara Injunction. (*Id.* at ¶ 38). Presumably, plaintiffs were aware that if McBride and Pokalsky joined Havens within the 15-foot no-protest zone, plaintiffs would be in violation of the Arcara Injunction. *See Vacco v. Operation Rescue Nat'l*, 80 F.3d at 71 ("by acting in concert with [party bound by injunction] and with notice of the 1992 Injunction, the remaining [non-party] Respondents were also so bound"). In any event, though, given the coordinated efforts of McBride, Pokalsky, and plaintiffs, McBride and Pokalsky did not need to cross into the buffer zone themselves for the Arcara Injunction to be violated because plaintiffs did so pursuant to their same basic goals. *See Roe*, 54 F.3d at 139 ("[w]hen a

party to the [injunction] urges others to participate in conduct violative of the [i]njunction, such encouragement may itself suffice to support a finding of contempt"[;] . . . nonparties acted "in concert" with enjoined parties where nonparties "coordinated activities" with enjoined parties to violate the injunction ).

Third, Havens provided the same legal counsel to Warren, the leader of Named Defendant Rescue Rochester, as he did to McBride and Pokalsky. (Dkt. # 1 at ¶ 53). As with McBride and Pokalsky, plaintiffs do not allege that Warren's sidewalk counseling was done independent of plaintiffs' own sidewalk counseling (*id.* at ¶¶ 52-56), which similarly suggests that Warren, as the leader of Rescue Rochester, coordinated his efforts to sidewalk counsel with plaintiffs. Further suggestive of this coordination between Warren, Rescue Rochester, and plaintiffs, is that Rescue Rochester promoted Havens's sidewalk counseling training sessions at Focus Pregnancy Help Center on its Facebook page (*id.* at ¶ 43(a)), and that Rescue Rochester explicitly solicited its own members to join in plaintiffs' activities outside PPR (*id.* at ¶ 43(c)).[8]

Plaintiffs do not deny that all these coordinated efforts – detailed in the complaint – occurred. Rather, they deny that these efforts show that plaintiffs acted in concert or participation to aid and abet any enjoined defendant to violate the Arcara Injunction. (Dkt. # 11 at 10 n.2). Plaintiffs also assert that, the concerted efforts of the Named Defendants to aid plaintiffs notwithstanding, they are not aware that the enjoined defendants violated the Arcara Injunction. (Dkt. # 1 at ¶¶ 47, 51, 56; *see also* Dkt. # 11 at 15 ("lack of evidence that those enjoined by the

---

[8]   It is quite possible that Jost (through Focus Pregnancy Help Center) and Rescue Rochester, by soliciting Rochester-area residents to join in plaintiffs' conduct at PPR, actually solicited persons qualifying as "John and Jane Does," and who are directly bound by the Arcara Injunction as named parties to the injunction. *See supra*, n.2. In my view, such John and Jane Does may be persons who are active members in Rescue Rochester, for example, and plaintiffs could accordingly also act in concert or participation with such John and Jane Doe defendants. This is not evident from the complaint, however, as plaintiffs do not make specific allegations regarding the composition of ROC Love, except to say that it consists of Rochester-area residents who are "pro-life individuals." (Dkt. # 1 at ¶¶ 1, 14).

[Arcara] Injunction have violated it . . . eliminat[es] the possibility that plaintiffs themselves could have done so by aiding and abetting")).  This is wishful thinking on plaintiffs' part.

As stated above, plaintiffs crossed into the 15-foot no-protest zone numerous times in 2017 and 2018 to sidewalk counsel, which itself violated the Arcara Injunction.  (*See* Dkt. # 1-1 at ¶ 1(G) (restraining enjoined persons from "*being present* within fifteen feet of either edge of any doorway, walkway or driveway entrance to any such facility") (emphasis supplied)).  Moreover, plaintiffs' complaint illustrates that these violations were enabled through the coordinated efforts of plaintiffs and the Named Defendants.  On the one hand, plaintiffs benefitted from the aid and resources given to them by the Named Defendants by way of shared office space for training plaintiffs' members, shared member participation between plaintiffs and Rescue Rochester, McBride, and Pokalsky, and the Named Defendants' advertising and publicizing of plaintiffs' activities.  On the other hand, McBride, Pokalsky, and Rescue Rochester (through Warren) also benefited from plaintiffs' legal counsel regarding the Arcara Injunction.  Stated differently, plaintiffs coordinated efforts with Jost, McBride, Pokalsky, and Rescue Rochester, not only to further their collective common goal, but also to attempt to avoid any potential violation of the Arcara Injunction in doing so.

These coordinated efforts between plaintiffs and the Named Defendants make sense – all persons involved with plaintiffs' activities, including the Named Defendants, share the same common goal of deterring "abortion-minded" women from seeking services at PPR.  Plaintiffs and the Named Defendants are well aware that plaintiffs' goal in doing so is no different than those explicitly named in the Arcara Injunction and, indeed, plaintiffs seek to accomplish this goal through similar, if not the same, means as those original defendants.  Any suggestion that plaintiffs

acted "independent" from these Named Defendants, therefore, is not only disingenuous, but is also belied by plaintiffs' own allegations.

It is of no moment that plaintiffs allege they did not act in concert or participation with the Named Defendants "for the purpose of aiding and abetting" a violation of the Arcara Injunction, or that they are "unaware" that the Named Defendants violated the injunction. As stated above, in these circumstances, the Court's focus is on the "actuality of concert or participation," regardless of a party's motive. *See Eli Lilly & Co.*, 617 F.3d at 193; *see, e.g.*, *Arista Records, LLC*, 112 F. Supp. 3d at 38 ("for the purpose of determining whether [non-party] is in active concert or participation with [enjoined defendants], it is not determinative that . . . [non-party] lacks a specific desire or motivation to help [enjoined defendants] violate the injunction"). For the reasons already discussed, the "actuality" of plaintiffs' concert and participation with the Named Defendants to illegally cross into the buffer zone is striking from the face of the complaint.

In addition, regardless of whether the Named Defendants have actually crossed into the 15-foot buffer zone, plaintiffs conveniently overlook that those persons named in the Arcara Injunction are also enjoined and restrained from "inducing, directing, [or] aiding and abetting *in any manner*, others to take any of the actions" described in the injunction. (Dkt. # 1-1 at ¶ 4 (emphasis supplied)). Without question, the coordinate efforts taken by the Named Defendants described above – providing office space to conduct trainings, soliciting memberships for plaintiffs, and advertising and publicizing on behalf of plaintiffs – constituted at least *a* manner of "inducing, directing, [or] aiding and abetting" plaintiffs to violate the Arcara Injunction by sidewalk counseling within the buffer zone in 2017 and 2018. *See Roe*, 54 F.3d at 139 (named defendant violated injunction by "helping to organize, publicize, and raise money" for

anti-abortion campaign that "instigated" a violation of the injunction, even though named defendant was not present at the protest).

For the reasons stated above, then, the face of plaintiffs' complaint demonstrates that their sidewalk counseling within the 15-foot buffer zone outside PPR is a violation of the Arcara Injunction, as plaintiffs are "in active concert or participation" with parties enjoined by the injunction. Plaintiffs are, therefore, bound by the terms of the Arcara Injunction, including the 15-foot no-protest buffer zone provision. Plaintiffs' complaint thus fails to state a claim for relief.

## II.      Plaintiff's Motion for a Preliminary Injunction

In light of my finding that plaintiffs have failed to state a claim for relief, I deny plaintiffs' pending motion for a preliminary injunction as moot. *See, e.g.*, *McMillian v. Konecny*, 2018 WL 813515, *2 (N.D.N.Y. 2018) ("where no complaint remains pending, no motion for a . . . preliminary injunction remains available") (collecting cases); *Lopez v. Lando Resorts Corp.*, 2015 WL 3473894, *4 (D. Conn. 2015) ("because the court grants [defendant's] motion to dismiss, it terminates as moot [plaintiffs'] motion for preliminary injunction") (emphasis omitted); *Chase Grp. Alliance LLC v. City of New York Dep't of Fin.*, 2009 WL 1619905, *5 (S.D.N.Y. 2009) (denying plaintiffs' motion for a preliminary injunction as moot where the court granted defendants' motion to dismiss the complaint), *aff'd*, 620 F.3d 146 (2d Cir. 2010).

Even if not moot, though, I note that plaintiffs' motion for a preliminary injunction is also meritless. Plaintiffs have not shown the requisite irreparable harm necessary for such relief, but rather mere inconvenience. The Second Circuit held that the Arcara Injunction – which, again, plaintiffs do not challenge here – passed constitutional muster, noting that the injunction was "content neutral," served to protect "significant governmental interests," and still enabled pro-life

individuals at PPR, such as plaintiffs, to effectively communicate their message.  *See Operation Rescue Nat'l*, 273 F.3d at 202-03, 211.

The Second Circuit also noted that the United States Supreme Court had determined that the sidewalk-counselor exception was not required by the Constitution.  *Id.* at 211-12.  The Circuit stated that besides being "a constitutionally unnecessary accommodation," the exception complicated enforcement of the injunction.  *Id.* at 211.  The exception had proven to be a "primary tool" to facilitate disruption at facilities like PPR, and it was impossible for law enforcement and security to determine who was covered by the exception.[9]  These considerations supported exclusion of "all protestors" from the buffer zones, as the injunction was "narrowly tailored to serve the government interest in protecting clinic access."  *Id.* at 211.

In addition, for the reasons stated in my analysis of defendants' motions to dismiss, it is my view that plaintiffs cannot demonstrate either a likelihood of success on the merits, or sufficiently serious questions regarding the merits of their claims to make them fair grounds for litigation, plus a balance of the hardships tipping decidedly in their favor.  The face of the complaint clearly demonstrates the great lengths to which plaintiffs and enjoined parties went to coordinate their efforts to violate the Arcara Injunction.  Accordingly, plaintiffs are "in active concert or participation" with enjoined defendants.

---

[9]  Germaine to the case now before the Court, the Second Circuit also noted the following: "We further note that the clarity of a non-porous no-protest zone will help police violations of the District Court's order." *Id.* at 211.  If Havens's narrow interpretation of the Arcara Injunction is upheld, it will make enforcement of that injunction virtually impossible.  Havens and others could find like-minded protestors who are not specifically named in the Arcara Injunction and urge them to appear at PPR and flood the 15-foot zone and engage in sidewalk counseling, which is exactly what the Arcara Injunction was designed to prevent.  One could imagine a different group arriving to protest at PPR weekly, which would effectively negate the balance effected by the Arcara Injunction as affirmed by the Second Circuit.

**<u>CONCLUSION</u>**

For the reasons stated above, I find that the face of plaintiffs' complaint demonstrates that they are "in active concert or participation" with persons enjoined by the Arcara Injunction, and thus, are themselves bound by the terms of the injunction. Accordingly, defendants' motions to dismiss (Dkt. ## 6, 7) are granted, and plaintiffs' motion for a preliminary injunction (Dkt. # 2) is denied. Plaintiffs' complaint for declaratory and injunctive relief (Dkt. # 1) is therefore dismissed with prejudice.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
January 24, 2020.